## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| RICHARD DALE HELMS, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 24-CV-6928 |
| | : | |
| SUPERINTENDENT SORBER, *et al.*, | : | |
| Defendants. | : | |

### MEMORANDUM

SÁNCHEZ, J.                                                                FEBRUARY 9, 2026

Plaintiff Richard Dale Helms, a prisoner currently incarcerated at SCI Waymart, filed this civil rights action pursuant to 42 U.S.C. § 1983, claiming that the Defendants—Superintendent Sorber, certain medical staff employed by Wellpath, LLC (the "Wellpath Defendants"), *i.e.*, Dr. Anthony Letizio, Dr. Saeed Bazel, Dr. Jason Goldberg, PA Stephen Kaminsky, PA Joseph Walsh, and PA Jeanne Defrangesco, and the employee of a subcontractor, PA Matthew Riley[1]—were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment while he was incarcerated at SCI Phoenix.[2]  (ECF No. 1 ("Compl.").)  The Defendants have all filed Motions to Dismiss, to which Helms has responded.  For the following reasons, the Court will grant Defendants' Motions and dismiss Helms's Complaint.

---

[1]     The Court will use the spellings that the Defendants have provided for their names, rather than the spellings in the Complaint.

[2]     After granting Helms leave to proceed *in forma pauperis*, the Court dismissed certain of Helms's claims, specifically, claims for injunctive relief, official capacity claims for damages against Defendant Sorber, substantive due process claims, and claims against certain Defendants against whom no facts were alleged.  (ECF No. 10.)  The Court then directed service of the remaining Eighth Amendment claims for damages against the remaining Defendants.  (*Id.*)

1

## I.   FACTUAL ALLEGATIONS

Helms alleges the Defendants acted with deliberate indifference by failing to adequately diagnose and provide treatment for what appeared to be an ongoing rash on his right leg that ultimately became so infected he required surgery to remove the leg.  His Complaint describes numerous medical visits over a period of twenty-six months that did not resolve his condition. Helms initially met with Defendant PA Defrangesco on October 12, 2020, regarding the rash, which Defrangesco did not diagnose but thought was dermatitis.  (Compl. at 5.)  At a "follow-up consultation" on October 20, 2020, PA Kaminsky diagnosed the rash as cellulitis and prescribed an anti-fungal treatment, even though Helms notes that cellulitis is an "acute bacterial infection of the skin" that can worsen if antibiotics are not taken.  (*Id.* at 5-6 & n.5.)  For several months, Helms was "evaluated and 'treated' by multiple triage nurses," apparently without success.  (*Id.* at 6.)

On June 1, 2021, Helms had a consultation with PA Defrangesco regarding the rash.  (*Id.*) She told Helms the rash "would take time to go away, and to continue with the same treatment as it was a fungal condition."  (*Id.*)  Two weeks later, Helms had a consultation with PA Walsh, who advised him similarly.  (*Id.*)  The rash, however, did not go away.

On July 13, 2021, PA Defrangesco prescribed Prednisone, a steroid treatment, for the rash. (*Id.*)  Nine days later, Helms met with PA Walsh, who prescribed Hydrine.  (*Id.*)  Five days after that, PA Riley prescribed Doxycycline, an antibiotic, for Helms and "set up a timeline for a Telemed consultation" with a dermatologist.  (*Id.*)  However, Helms ultimately "was not set up for such a consultation," although the reason why is unclear.  (*Id.*)  At this point, the rash had continued for six to eight months.  (*Id.*)

On August 17, 2021, a physician's assistant who was not named as a Defendant attempted to set up a consultation with a dermatologist, but, again, Helms "was not granted a consultation"

for reasons that are not apparent from the Complaint. (*Id.* at 6-7.) On August 25, 2021, PA Kaminsky "performed a 'punch biopsy'" on Helms's back, the results of which "showed nothing." (*Id.* at 7.) Helms consulted with Defrangesco on the same day, but "nothing was done toward treatment." (*Id.*)

Helms "was interviewed by Dr. Bazel" about the rash on September 8, 2021. (*Id.*) The doctor prescribed Zyrtec-D/Kenolog, but that treatment was unsuccessful. (*Id.*) Thereafter, he was prescribed polydimethysiloxane cream by another physician's assistant and was later prescribed Aristocort by Dr. Bazel after a second interview. (*Id.*) Helms met with Dr. Goldberg on October 22, 2021, and the doctor prescribed Atarax. (*Id.*)

Following a year of unsuccessful treatments, PA Kaminsky diagnosed the rash as scabies. (*Id.*) As a result of that diagnosis, Helms and his cellmate "were quarantined, and were compelled to remove their clothing and utilize a special cream on the entirety of their bodies." (*Id.* at 7-8.) This treatment was unsuccessful, and Helms was then "informed that the timeline for correction of his rash would take time to 'mend.'" (*Id.* at 8.) Helms alleges that he "followed the information provided and the [advice] that was given of waiting for a general resolution by allowing his body to perform its functions, however, this was no longer possible as the condition gradually got worse." (*Id.*)

On March 22, 2022, five months after the last medical appointment described in the Complaint, Helms submitted a "sick call" because his leg had been "severely swollen" for several days, causing physical illness. (*Id.*) He was sent to the "Trauma Triage room" the next day and then admitted to the infirmary for a twenty-four-hour hold. (*Id.*) He alleges he was observed but released the next day and "told that the swelling would reduce on its own and the rash would go away." (*Id.*)

Nine months later, on December 23, 2022, Helms was found in his bed after two days of "non-activity." (*Id.*) He was rushed to the infirmary, where he was given Bactrim orally and Vanco intravenously. (*Id.* at 9.) One of the nurses who was treating Helms noted that his right lower leg was "red with infection." (*Id.*) Helms was then sent to the hospital at Dr. Letizio's direction. (*Id.*) At the hospital, Helms was told "that if the medical department would have waited an additional two, (2), days, the infection would have spread throughout his body, and he could have died." (*Id.*) He was taken to surgery "where his right leg was removed." (*Id.*) "The surgeons alluded to the fact that if the prison had properly diagnosed, acted upon, or even done simple tests such as blood, xray, etc., they could have noticed it was an infection, however, none of these were completed." (*Id.*) Helms alleges that the sub-standard care he received violates the Eighth Amendment's prohibition against deliberate indifference to a prisoner's serious medical needs. (*Id.* at 9-16.) The Defendants have all moved to dismiss the claims against them on substantive and procedural grounds. (Sorber Mot., ECF No. 19; Wellpath Defs.' Mot., ECF No. 29; Riley Mot. 43.)

## II.   STANDARD OF REVIEW

"A 12(b)(6) motion tests the sufficiency of the allegations contained in the complaint." *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss under Rule 12(b)(6), the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere

4

conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). "Although the plausibility standard does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted).

In resolving a Rule 12(b)(6) motion, "a court must consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). To determine whether a complaint filed by a *pro* se litigant states a claim, a court must accept the facts alleged as true, draw all reasonable inferences in favor of the plaintiff, and "ask only whether that complaint, liberally construed contains facts sufficient to state a plausible . . . claim." *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (cleaned up), *abrogation on other grounds recognized by Fisher v. Hollingsworth*, 115 F.4th 197 (3d Cir. 2024); *see also Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (*pro se* filings are construed liberally). Dismissal of a complaint based on an affirmative defense is only appropriate at the pleading stage when the "defense is apparent on the face of the complaint." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017). When considering dismissal based on an affirmative defense, a court "may not allocate . . . [burdens] . . . in a way that is inconsistent with the rule that a plaintiff is not required to plead, in a complaint, facts sufficient to overcome [the] affirmative defense." *Schmidt v. Skolas*, 770 F.3d 241, 251 (3d Cir. 2014) (internal citation omitted). Rather, the burden of pleading and proving an affirmative defense is borne by the defendant. *Williams v. Runyon*, 130 F.3d 568, 573 (3d Cir. 1997). It is also the defendants' burden to show that a complaint fails to state a claim. *See Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (explaining that on a

Rule 12(b)(6) motion to dismiss, the "defendant bears the burden of showing that no claim has been presented").

## III.  DISCUSSION

### A.  Deliberate Indifference to Serious Medical Needs

The Defendants all argue that Helms has failed to state a plausible Eighth Amendment claim against them.  To state an Eighth Amendment claim based on the failure to provide medical treatment, a prisoner must allege facts reflecting that prison officials were deliberately indifferent to his serious medical needs.  *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994).  "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted).  A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer*, 511 U.S. at 837.

Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment."  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).  In contrast, allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).  "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners."  *Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993).  Inadequate

care may nevertheless give rise to a deliberate indifference claim when a defendant "act[s] with the requisite state of mind when providing that inadequate care." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017). However, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004).

### 1. Sorber

Sorber argues that Helms has failed to plausibly allege both his personal involvement in Helms's medical treatment and that he exhibited deliberate indifference to Helms's medical needs. (ECF No. 19, at 8-10.) A plaintiff states a claim under § 1983 by alleging that the defendant violated his constitutional rights while acting under color of law. *West v. Atkins*, 487 U.S. 42, 48 (1988). To establish individual liability in a § 1983 action, the personal involvement of each defendant in the alleged constitutional violation is a required element, so a plaintiff must allege how each individual defendant was involved in the events and occurrences giving rise to his claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998). Additionally, "[s]uits against high-level government officials must satisfy the general requirements for supervisory liability." *Wharton v. Danberg*, 854 F.3d 234, 243 (3d Cir. 2017). A supervisor may be liable if he acts with deliberate indifference while establishing or maintaining a policy, practice, or custom that caused the alleged constitutional violation. *Barkes v. First Corr. Med., Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S. 822 (2015). "[A] supervisor may [also] be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.*

7

Helms claims Sorber acted personally, and with deliberate indifference, when he failed to investigate alleged inadequacies in his care after reviewing Helms's grievances. (ECF No. 28, at 6-13.) However, there are no allegations in the Complaint describing Sorber's involvement in the grievance process or his awareness of the issues Helms was experiencing with the medical department through grievances or otherwise. Further, the grievance to which Helms refers in his Complaint and his response, Grievance #1020905, (*id.* at 8-9; Compl. at 22), was filed after he lost his leg, (ECF No. 19-1 at 2). Sorber is correct that, even if he became aware of Helms's circumstances through this grievance and failed to investigate, those facts would be insufficient to state a plausible claim against him based on the underlying events described in the grievance. *See Dooley v. Wetzel*, 957 F.3d 366, 374 (3d Cir. 2020) (holding that attaching documents to a grievance form is insufficient to show personal direction or actual knowledge by recipient of underlying facts); *see also Robinson v. Delbalso*, No. 22-2378, , at *2 (3d. Cir. Nov. 28, 2022) (*per curiam*) ("Contrary to Robinson' s assertions, awareness of a grievance or complaint after the allegedly unconstitutional conduct has occurred, without more, is insufficient to establish personal involvement."); *Curtis v. Wetzel*, 763 F. App'x 259, 263 (3d Cir. 2019) (*per curiam*) ("The District Court properly determined that Defendants Wenerowicz, Lewis, and Shaylor – who participated only in the denial of Curtis' grievances – lacked the requisite personal involvement [in the conduct at issue]."); *Folk v. Prime Care Med.*, 741 F. App'x 47, 51 (3d Cir. 2018) (*per curiam*) ("Although some of these defendants were apparently involved in responding to some of Folk's prison grievances, there are no allegations linking them to the underlying incidents and thus no basis for liability based on those later grievance reviews."); *Mincy v. Chmielsewski*, 508 F. App'x 99, 104 (3d Cir. 2013) (*per curiam*) ("[A]n officer's review of, or failure to investigate, an inmate's grievances generally does not satisfy the requisite personal involvement.").

Sorber is also correct that Helms has not alleged a plausible basis for deliberate indifference based on any failure to intervene in the allegedly inadequate medical care. As noted, Helms has not pled facts establishing that Sorber was aware of any inadequacies in care and, in any event, Sorber is a non-medical prison official who was entitled to rely on the medical judgment of the doctors and other medical professionals who were treating Helms. *See Spruill*, 372 F.3d at 236 ("Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor."); *Stewart v. Pa. Dep't of Corr.*, 677 F. App'x 816, 819 (3d Cir. 2017) (*per curiam*) (affirming dismissal of claims where plaintiff "claimed that these Defendants, supervisory officials who do not participate in individual medical care decisions, simply failed to intervene in his medical care. Such a claim is not viable under the Eighth Amendment"); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so."). Further, allegations that Sorber is a "policymaker" who "knew" or "should have known" or "was in the position to know" that Helms was at risk of losing a limb due to "the failures and lack of treatment incurred," (Compl. at 2, 14), are essentially conclusory allegations that impermissibly seek to impose liability on Sorber simply because he held a high-level position at SCI Phoenix. *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir. 2020) (*per curiam*) ("Saisi asserted that some defendants were 'in charge of agencies that allowed this to happen,' and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d

9

Cir. 2005)). In sum, nothing in Helms's Complaint or Response suggests a plausible basis for a deliberate indifference claim against Sorber.

### 2. Remaining Defendants

The Wellpath Defendants and Riley also argue for dismissal for failure to plausibly allege deliberate indifference. They note that Dr. Letizio is not alleged to have treated Helms at all and that the other medical professionals provided treatment, which cannot amount to deliberate indifference even if Helms disagreed with the course of that treatment or the treatment was ineffective. (ECF No. 29 at 14-16.) Riley similarly argues that, since he treated Helms with an antibiotic and attempted to set up a telemedicine visit with a specialist, he did not act with deliberate indifference as a matter of law.[3] (ECF No. 43 at 8-12.)

Helms acknowledges that his only direct contact with Dr. Letizio was when the doctor examined him on December 23, 2022, and ordered the ambulance. (ECF No. 45 at 3.) He contends, however, that Dr. Letizio was "the Supervising Doctor" who "[e]ssentially allow[ed] his subordinates to 'Run Wild' without any apparent guidance" thereby precluding Helms from seeing a specialist and delaying his care. (ECF No. 45 at 3-10.) Helms alleges that the remaining Wellpath Defendants and Riley were deliberately indifferent to his serious medical needs by failing to order tests, prescribing ineffective treatment that did not resolve his condition, and failing to ensure that he saw a specialist when his symptoms did not abate. (ECF No. 45 at 10-17; ECF No. 46 at 14-16.)

---

[3]    Riley also contends that Helms has failed to plead that Riley's actions or inactions were the cause of his injuries or that he suffered from a serious medical need at the time Riley treated him. (ECF No. 43 at 12-14.)

Even under a liberal reading of the Complaint as clarified by Helms's responses to the Defendants motions,[4] Helms has not alleged sufficient facts to raise a plausible inference of deliberate indifference.  While it is not clear whether Helms initially presented with a "serious" medical need, his condition worsened over two years into a serious infection that resulted in the loss of his leg, which constitutes a serious medical need for purposes of the analysis.  *See Salvani v. Corizon Health, Inc.*, 844 F. App'x 254, 257 (11th Cir. 2021) (holding that a reasonable jury could conclude that medical needs were serious at the time Defendant evaluated symptoms that later worsened to sepsis, causing amputation).  "[A] doctor's choice of the 'easier and less efficacious treatment' for an objectively serious medical condition can . . . amount to deliberate indifference for purposes of the Eighth Amendment." *See Berry*, 604 F.3d at 441.  However, "[i]n general, good-faith efforts to remedy the plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances.  That is why, for example, when medical personnel examine and diagnose a patient, where they try to help but fail to live up to expectations, that is more naturally described as negligence than indifference." *Moreno v. Bosholm*, 151 F.4th 543, 573-74 (4th Cir. 2025) (cleaned up).

Helms's factual allegations describe numerous medical visits with the Defendants and other medical professionals for what initially appeared to be a rash that was unresponsive to the

---

[4]    When evaluating a motion to dismiss, a court may look to "allegations contained in the other court filings of a pro se plaintiff" to clarify statements made in the complaint. *Swofford v. Mandrell*, 969 F.2d 547, 549 (7th Cir. 1992); *see also Am. W. Bank Members v. Utah*, No. 23-4091, 2024 WL 3812451, at *9 (10th Cir. Aug. 14, 2024), *cert. denied sub nom.*,145 S. Ct. 2796 (2025) ("[W]e may use plaintiff's brief to clarify allegations in her complaint whose meaning is unclear. This general rule does not apply here, where the allegations are not unclear but absent." (cleaned up)); *Maio v. Aetna, Inc.*, 221 F.3d 472, 485 n.12 (3d Cir. 2000) ("[W]hile this case involves a motion to dismiss under Rule 12(b)(6), the Supreme Court . . . confirmed that we may use appellants' brief 'to clarify allegations in the complaint whose meaning is unclear.'" (quoting *Pegram v. Herdrich*, 530 U.S. 211, 230 n.10 (2000))).

various treatments they prescribed.  Each time Helms was seen, the Defendants attempted to diagnose the issue, prescribed a new or different treatment, or recommended that he continue to follow the medical course he was on and exercise patience because resolution could take time. Unfortunately, none of these treatments or approaches were successful, leading to the loss of Helms's leg.  Helms asserts that the Defendants should have prescribed additional tests (beyond the one punch biopsy)[5] or taken a different course of action.  Even if that is the case, decisions about which tests to order or medications to prescribe are generally considered medical judgments that, without more, do not support a deliberate indifference claim, even when a defendant acts erroneously or commits medical malpractice.  *See, e.g.*, *Estelle v. Gamble*, 429 U.S. 97, 107 (1976) ("[T]he question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice."); *West v. Schultz*, No. 22-11541, 2025 WL 3123674, at *7 (11th Cir. Nov. 7, 2025) ("West has failed plausibly to allege an Eighth Amendment violation for deliberate indifference. As the Supreme Court explained in *Estelle*, the doctors' alleged failure to order 'additional diagnostic' testing and more 'forms of treatment' were 'matter[s] for medical judgment' that did not constitute deliberate indifference."); *Johnson v. Cash*, 557 F. App'x 102, 104 (3d Cir. 2013) (*per curiam*) ("The record indicates that Johnson has, at most, a disagreement with the course of treatment being provided by the prison medical staff.  The failure to perform x-rays or order additional diagnostic tests does not rise to the level of cruel and unusual punishment."); *McCluskey*

---

[5]      Helms notes that this biopsy was taken from his shoulder, rather than his leg, but he also alleges that PA Kaminsky, who ordered the biopsy, told him that the location of the biopsy should not affect the results.  (ECF No. 45 at 14-15.)  Even if PA Kaminsky was incorrect, this is not reflective of deliberate indifference.

*v. Vincent*, 505 F. App'x 199, 203 (3d Cir. 2012) ("There is no evidence the decision not to order an immediate biopsy or dermatology consultation was made with deliberate indifference to McCluskey's condition or was based on anything other than medical judgment.   At best, McCluskey has presented evidence of a misdiagnosis and possible medical malpractice, and this is insufficient."); *Bramson v. Sulayman*, 251 F. App'x 84, 86 (3d Cir. 2007) (*per curiam*) ("Bramson's complaint makes clear that the defendants treated him on many occasions. He claims that those treatments proved ineffective and that defendants negligently failed to diagnose his heart condition, but those allegations do not state an Eighth Amendment claim.").

Nothing in Helms's Complaint (or the arguments in his Responses) supports an inference that these medical personnel based their treatment decisions or recommendations on something apart from the exercise of medical judgment when they treated him, even if those decisions were based on mistaken beliefs about the nature of his condition.  Notably, the last time Helms was seen by any of the named medical defendants was October 22, 2021—five months before he was sent to the infirmary with a "severely swollen right leg" that caused him "to be extremely physically ill," and fourteen months before the hospital visit when his leg was amputated.  (Compl. at 8.)  He does not describe his condition in that time, what medical care he sought or received during that time, and what role, if any, the Defendants played in treating him during that time.  In other words, taken as a whole, Helms's factual allegations fall short of raising an inference that the Wellpath Defendants and Riley had reason to think that they were exposing Helms to the loss of a limb or other serious health risk acted at the time they made each of their treatment decisions, knew he had an infection in his leg but declined to treat it, or otherwise acted with the requisite state of

13

mind under the circumstances.[6]  *See Dana v. Idaho Dep't of Corr.*, No. 23-35047, 2024 WL 2862581, at *1 (9th Cir. June 6, 2024) (affirming dismissal of deliberate indifference claims "based on the long delay" in receiving diagnosis: "Dana does not plausibly allege that—of the twenty-one defendants named in claim one and three who remain on appeal [several of whom attended only one treatment meeting]—any defendant knew of the severity of her circumstances and consciously disregarded that known excessive risk to her health."); *Reilly v. Vadlamudi*, 680 F.3d 617, 625 (6th Cir. 2012) ("The Complaint alleges Dr. Vadlamudi failed to: obtain and appreciate an appropriate medical history; obtain appropriate diagnostic studies; include malignant tumor in the diagnosis; promptly refer Plaintiff to or consult with a specialist; provide timely medical care; and ensure Plaintiff is evaluated by a physician.  These allegations may support a claim for professional negligence, but under established law, deliberate indifference entails something more than mere negligence." (cleaned up)).

The deliberate indifference claim is particularly problematic as to Dr. Letizio because it does not appear that Dr. Letizio actually treated Helms.  Rather, Helms appears to have included Dr. Letizio as a Defendant based solely on the fact that he supervised the medical department and

---

[6]  Helms also pursues a deliberate indifference theory based on the delay of care.  (Compl. at 12.)  However, with the possible exception of the dermatological consult (discussed further below), he has not described care prescribed by a medical professional that was then delayed.  To the contrary, the logical inference from Helms's factual allegations is that the cause of his harm was the Defendants' diagnosis and treatment decisions that did not resolve his medical issue.  (*Id.* at 15 (alleging that "he was improperly diagnosed, then continually improperly treated for that diagnosis").).  *See Stewart*, 677 F. App'x at 820 ("He also complained, however, about the timeliness of the interventions—that Defendants initially misdiagnosed his fracture, resulting in its delayed treatment.  But such a diagnostic failure, at worst, amounts to medical malpractice, which is not actionable under the Eighth Amendment.")  Further, to the extent Helms takes issue with the requirement that prisoners submit "sick call" slips to obtain medical treatment for non-emergent issues, it is difficult to understand how the sick call slip procedure would amount to deliberate indifference or how such a procedure caused the adverse outcome in this case.  (*See id.* at 13-14 (suggesting that the procedure was "arbitrary and burdensome" and delayed Helms's care without explaining why that is so).)

allowed his subordinates to make the treatment decisions they did. (ECF No. 45 at 18 (arguing that "Letizio can assert he did not treat this Plaintiff. The fact of the matter, Defendant Letizio was in charge of the Co-Defendants, thereby making him just as guilty, for failing to treat, follow-up and correct the serious medical condition." (capitalization omitted)); *id.* at 26 (arguing that since Dr. Letizio was the "Supervising Doctor" it was "his job to ensure each prisoner was receiving proper medical care" (capitalization omitted).) Without additional allegations about Dr. Letizio's personal involvement in Helms's treatment, his actual knowledge of the situation and deliberate indifference thereto, or his imposition of a policy or custom that caused Helms's harm, such allegations are not a proper basis for Dr. Letizio's liability solely due to his position as the supervisor of the other medical providers. *See generally Dooley*, 957 F.3d at 374 ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)).

Helms also rests his claims on the fact that he did not receive care from a specialist. He relies on *Brock v. Wright*, 315 F.3d 158, 160 (2d Cir. 2003), in which the Court of Appeals for the Second Circuit vacated a grant of summary judgment on a deliberate indifference claim against defendants who promulgated a policy that was used to prevent the plaintiff from obtaining the care of a dermatologist for treatment to relieve chronic pain for a keloid, *i.e.*, an abnormal overgrowth of fibrous tissue that can cause disfigurement and constant pain. (*See* ECF No. 45 at 23.) In *Brock*, doctors and other medical professionals examined the prisoner-plaintiff following his complaints of pain, and confirmed the presence of a "large, thick keloid" that would benefit from referral. *Id.* at 161. However, the plaintiff's request for a referral was denied as "cosmetic" pursuant to a prison policy that forbid treatment of keloids absent "collateral symptoms." *Id.* at 161-62. The Court

15

held that a reasonable jury could find the Chief Medical Officer of the facility liable where the policy caused the denial of care. *Id.* at 165-66.

This case is distinguishable from *Brock*. Initially, in *Brock*, the medical diagnosis was apparent whereas, here, Helms's allegations suggest that the Defendants did not have a clear diagnosis and were attempting different courses of treatment for possible diagnoses in an effort to resolve his symptoms. Further, in contrast to *Brock*, where the denial of a specialist was the result of an institutional policy, it is not clear why Helms did not receive a dermatology consult and who would have been responsible for handling those logistics. He alleges that on July 27, 2021, Defendant Riley "set up a timeline for a Telemed consultation" with a dermatologist, but that no such consultation was ultimately set up. (Compl. at 6.) On August 25, 2021, another physician's assistant "again wanted to set up a timeline for a Telemed consultation" with a dermatologist but Helms alleges he "was not granted a consultation." (*Id.* at 6-7.) It is not apparent from these allegations what these "timelines" envisioned, why the consultation did not take place, and/or who made the decision not to "grant" the consultation. In the absence of such facts, Helms has not "nudged [his] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This is not to minimize the very real loss that Helms experienced. He may have a medical malpractice claim, but as a legal matter, he has not alleged that the Wellpath Defendants and Riley acted with deliberate indifference. However, since it is possible that Helms could amend these claims, the Court will consider the Defendants' arguments as to exhaustion.

### B. Exhaustion

Sorber and the Wellpath Defendants argue that Helms failed to exhaust administrative remedies in accordance with the Prison Litigation Reform Act ("PLRA"). (ECF No. 19 at 6-8; ECF No. 29 at 21-23.) The PLRA "mandates that prisoners exhaust internal prison grievance

16

procedures before filing suit." *Small v. Camden Cnty.*, 728 F.3d 265, 268 (3d Cir. 2013); *see* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."). Exhaustion is a non-jurisdictional "standard affirmative defense." *Perttu v. Richards*, 605 U.S. 460, 469 (2025). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006); *Prater v. Dep't of Corr.*, 76 F.4th 184, 203 (3d Cir. 2023) (courts "determine whether a prisoner has properly exhausted a claim by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances" (internal quotations omitted)). Claims that are not properly exhausted under the PLRA are procedurally defaulted. *See Woodford*, 548 U.S. at 92-93; *Spruill*, 372 F.3d at 230. "[W]here a defendant moves to dismiss based on a failure-to-exhaust defense and the exhaustion issue turns on indisputably authentic documents related to the inmate's grievances, [a court] may consider those documents without converting a motion to dismiss to a motion for summary judgment." *Rinaldi v. United States*, 904 F.3d 257, 261 n.1 (3d Cir. 2018); *Spruill*, 372 F.3d at 223 ("Given that the exhaustion issue turns on the indisputably authentic documents related to Spruill's grievances, we hold that we may also consider these without converting it to a motion for summary judgment."); *see, e.g.*, *Walker v. Little*, No. 22-3451, 2023 WL 2570562, at *1 (3d Cir. Mar. 20, 2023) (affirming grant of motion to dismiss based on failure to exhaust administrative remedies).

The DOC's applicable grievance policy, DC-ADM 804, sets forth a three-step process for review of inmate grievances.[7]  An inmate must initially submit a written grievance to the Facility Grievance Coordinator or his designee within fifteen working days after the event upon which the grievance is based.  DC-ADM 804, § 1.A(5), (8).  The Facility Grievance Coordinator has permission to consider extensions "on a case-by-case basis," including due to temporary transfers, if the inmate notifies the coordinator "of the reason for the delay."  *Id.* § 1.C(2).  The grievance must state the date, approximate time and location of the events giving rise to the grievance, must identify individuals directly involved in the events, and shall state any claims the inmate wishes to make based on those events.  *Id.* § 1.A(11).  "[A]ny grievance based on separate events must be presented separately, unless it is necessary to combine the issues to support the claim."  *Id.* § 1.A(14).  If a grievance is rejected, it may be re-submitted once under the same grievance number "within five working days of the rejection notice date."  *Id.* § 1.A(20).

An inmate has fifteen working days to appeal a rejected grievance in writing to the Facility Manager.  *Id.* § 2.A(1)(a).  If the Facility Manager rejects the appeal, the inmate may appeal for Final Review with the Secretary's Office of Inmate Grievances and Appeals ("SOIGA") within fifteen working days of the denial of the Facility Manager's appeal.  *Id.* § 2.B.  The SOIGA will respond to the Final Appeal within thirty working days of receipt "unless otherwise extended and/or referred."  *Id.* § 2.B(2) (emphasis omitted).

The parties agree that the relevant grievance here is Grievance #1020905, which Helms filed on February 20, 2023 after he returned from the hospital, grieving the "misdiagnosis" and

---

[7]    The Wellpath Defendants appended a copy of DC-ADM 804 to their Motion. (ECF No. 29-3.)   The policy is also available online at https://www.pa.gov/content/dam/copapwp-pagov/en/cor/documents/about-us/doc-policies/804%20Inmate%20Grievances.pdf (last visited Jan. 29, 2026).

"malpractice" of "Dr. Letizio, PA Walsh, PA Kaminsky, PA Defrangesco, and other PAs [whose] names I did not receive" for their failure to provide care from "a competent doctor specializing in dermatology and/or skin disease." (ECF 19-1 at 2-3 (cleaned up); Compl. at 22 (referring to Grievance #1020905).) In his grievance, Helms explained that he requested grievances at the hospital "but was informed [he] could not get any there and would have to wait until returning to the Prison." (ECF No. 19-1 at 3.) He further explained that in the prison infirmary, he requested a grievance from Correctional Officer Ross who told him that they "did not have any." (*Id.*) He was released from the infirmary on February 7, 2023. (*Id.*) In the same grievance, Helms raised issues related to his cell and the loss of his property during his hospital stay. (*Id.* at 3.)

Helms's grievance was rejected as untimely because it was not submitted within fifteen working days of the underlying events, and because "[g]rievances based on different events must be presented separately." (ECF No. 19-2 at 2.) Helms appealed, again noting that he did not have access to grievances while he was in the hospital or infirmary and that he first had access to the grievance system on February 8, 2023. (ECF No. 19-3 at 2.) The Facility Manager upheld the denial, noting that the facility's rules require a grievance to be submitted within fifteen working days after the event at issue, and also require grievances based on different events to be presented separately. (ECF No. 19-4 at 2.) The Facility Manager further noted that Helms "chose to appeal rather than resubmit. There is nothing further to add." (*Id.*)

There are several issues pertinent to whether Helms properly exhausted. Sorber and the Wellpath Defendants primarily argue for dismissal on that basis that Helms failed to fully exhaust Grievance #1020905 because he never appealed the Facility Manager's response to SOIGA. (ECF No. 19 at 8; ECF No. 29 at 22.) Helms, however, asserts that he filed a final appeal on March 3, 2023, although he is inconsistent regarding whether his final appeal was rejected or not processed.

19

(*Compare* ECF No. 28 at 3, 5; ECF No. 45 at 3 *with* Compl. at 22 (alleging that Helms appealed to SOIGA and that "the decision was affirmed").) Either way, the parties' factual dispute on this issue precludes the Court from reaching this argument at this early stage of the litigation.

That does not end the exhaustion inquiry, however, because Sorber and the Wellpath Defendants also argue Helms failed to properly exhaust because he did not comply with DC-ADM 804's requirements that he file within fifteen working days of the underlying events and grieve distinct issues separately. (ECF No. 19 at 7-8; ECF No. 29 at 22-23; ECF No. 32 at 1-2.) Initially, the Court rejects the Wellpath Defendants' argument that Helms failed to exhaust because he did not file a grievance within fifteen working days of each date he saw a Defendant for treatment. Helms's grievance and constitutional claims are predicated on his allegation that the care he received was so inadequate, he ultimately lost his leg due to a severe infection. In other words, he was dealing with a series of treatments over an extended course of time that, in his telling, caused the harm he experienced in December 2022, when he lost his leg. There is no way Helms could have filed a grievance capturing his deliberate indifference claims against the Wellpath Defendants within fifteen working days of the dates he received treatment because at those times he had no reason to know that he would lose his leg.

As to the timeliness of Grievance #1020905, Helms primarily argues that administrative remedies were not available to him while he was in the hospital and prison infirmary, such that his first opportunity to file a grievance following the loss of his leg was when he was released from the infirmary and returned to a cell block. (Compl. at 23; ECF No. 28 at 2; ECF No. 45 at 2.) He alleges that when he asked an officer in the infirmary about filing a grievance he was told, "We do not have any here, your best bet is to wait [until you are] on your block, then request one there." (ECF No. 28 at 2 (cleaned up).) Sorber and the Wellpath Defendants argue that, even if Helms

20

could not have accessed the grievance process during his stay in the hospital and infirmary, he was required to follow DC-ADM 804 and obtain an extension of time if he could not otherwise comply with the fifteen-day time limit, and that his failure to seek an extension translates to improper exhaustion. (ECF No. 29 at 23-24 ("Helms had to send a request for an extension to the facility grievance co-coordinator/designee and explain that he was in the hospital and did not have access to a grievance form. Helms chose not to comply with this requirement and request an extension."); ECF No. 32 at 1-2 ("Plaintiff failed to seek an extension, which resulted in one of the two reasons for his grievance being rejected.").)

Whether a grievance process is "available" depends on whether it is "capable of use for the accomplishment of a purpose," "accessible[,] or may be obtained." *Ross v. Blake*, 578 U.S. 632, 642 (2016) (internal quotations omitted). An administrative procedure is unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when it is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary prisoner can discern or navigate it"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 643-44.

It is apparent that the grievance process was not available to Helms while he was in the hospital or infirmary since he was told as much by the hospital staff and officials from whom he sought grievance forms in those locations. *See Hardy v. Shaikh*, 959 F.3d 578, 587 (3d Cir. 2020) ("Misleading or deceptive instructions from a prison official can also render a grievance process unavailable."); *see also Brown v. Croak*, 312 F.3d 109, 113 (3d Cir. 2002) ("Assuming security officials told Brown to wait for the termination of the investigation before commencing a formal

21

claim, and assuming the defendants never informed Brown that the investigation was completed, the formal grievance proceeding required by DC-ADM 804 was never 'available' to Brown within the meaning of 42 U.S.C. § 1997e."). Under such circumstances, he was required to seek an extension to file his grievance belatedly in accordance with the DOC's grievance procedures once those procedures became available to him. *See Talley v. Clark*, 111 F.4th 255, 263 (3d Cir. 2024) ("Because a request to extend or be excused from the 15-day deadline for filing a grievance is explicitly included as part of the Pennsylvania DOC's grievance procedures, a prisoner must request permission to file an untimely grievance under § 1.C.2 just as he must pursue the grievance itself."). However, although DC-ADM 804 contemplates extensions, it does not specify a particular procedure or time frame for seeking such an extension. *See* DC-ADM 804, § 1.C(2). In his initial grievance, which was directed to the Facility Grievance Coordinator and filed within fifteen working days of the date the grievance system became available to him, Helms explained the circumstances behind his delay in filing. (ECF No. 19-1 at 3.) Although he did not use the word "extension," Helms's explanation "notif[ed] the Facility Grievance Coordinator/designee of the reason for the delay." DC-ADM 804, § 1.C(2). It is unclear why this was not treated as an extension request or what the basis was, if any, for concluding that this request did not comply with the extension policy. A prison has a "duty in the first instance to reasonably communicate its policies" to prisoners. *Hardy*, 959 F.3d at 590 (internal quotations and alterations omitted); *see also Small*, 728 F.3d at 271 ("Remedies that are not reasonably communicated to inmates may be considered unavailable for exhaustion purposes."). Absent further clarity or instruction regarding how he was supposed to properly file an extension, the Court cannot conclude that Helms failed to comply with the DC-ADM 804's timeliness and extension requirements.

Regardless, Helms's grievance was denied for the additional reason that he failed to comply with DC-ADM 804's requirement to file a separate grievance for distinct incidents. (ECF No. 19-2 at 2 ("Grievances based upon different events must be presented separately.").) This independent basis for denying Helms's grievance is sufficient for the Court to conclude that Helms failed to comply with available procedures, even if his grievance had been considered timely. *See Frazier v. SCI Med. Dispensary Dr.*, 391 F. App'x 128, 130 (3d Cir. 2010) (*per curiam*) (finding grievance not properly exhausted where it "contained three separate issues, violating the prison's reasonable administrative procedure requiring that each claim be presented separately"); *Lyons v. Salamon*, No. 21-1892, 2025 WL 2658403, at *10 (M.D. Pa. July 31, 2025) (inmate failed to exhaust when, among other things, he failed to comply with requirement to file separate grievances for separate events), *report and recommendation adopted*, 2025 WL 2656050 (M.D. Pa. Sept. 16, 2025); *Presbury v. Wenerowicz*, 2021 WL 4803824, at *3 (E.D. Pa. Oct. 13, 2021) ("It is clear from this undisputed procedural history that the merits of Plaintiff's underlying grievance were never adjudicated due to various procedural deficiencies [including the failure to grieve distinct events separately]. As such, Plaintiff has not fully and properly exhausted his administrative remedies."). Additionally, the Court agrees with Sorber, (*See* ECF No. 19 at 8), that Helms's failure to identify him in Grievance #1020905 as among the "individuals directly involved in the event(s)," as required by DC-ADM 804, is an additional basis for concluding that the claim against Sorber was not properly exhausted. *See Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) ("Byrd did not identify Spencer in his November 3, 2008 grievance. Additionally, there is no indication that prison administrators were aware that Spencer was allegedly involved with the events surrounding the grievance before Byrd filed suit. The District Court thus properly granted summary judgment to Spencer."); *see also Vo v. Wetzel*, No. 22-1210, 2022 WL 1467978, at *1

23

(3d Cir. May 10, 2022) (*per curiam*) ("We agree with the District Court's conclusion that Vo failed to exhaust her claims against Major Dodds and Superintendent Oliver.  Vo did not identify them by name in her initial grievance, nor were they identified in her grievance appeals, except for a reference to reporting the confiscation of her property to Oliver after the fact."); *Jackson v. Carter*, 813 F. App'x 820, 823-24 (3d Cir. 2020) (*per curiam*) ("To the extent that Grievance No. 572199 addressed Jackson's underlying claims of retaliation and conspiracy, it did not name any of the defendants in this lawsuit.  Accordingly, the District Court properly deemed the grievance unexhausted for PLRA purposes."); *Payne v. Duncan*, 692 F. App'x 680, 681 (3d Cir. 2017) (*per curiam*) ("A Pennsylvania inmate's failure to properly identify a fact relevant to a claim—including the identity of a defendant—in a grievance constitutes a failure to properly exhaust his administrative remedies as to that defendant.").  In sum, since Helms did not properly follow DC-ADM 804, he did not properly exhaust his deliberate indifference claims.[8]

## V.   CONCLUSION

For the foregoing reasons, the Defendants Motions will be granted because, although what happened to Helms was unfortunate and even tragic, his factual allegations do not support an inference of deliberate indifference (as opposed to medical malpractice).  Further, although the Court would normally permit amendment of those claims in the event Helms could allege additional facts on the issue of deliberate indifference, it is apparent that amendment would be futile since Helms did not properly exhaust his claims.  Accordingly, leave to amend will not be granted.  An appropriate order follows, which shall be docketed separately.  *See* Fed. R. Civ. P. 58.

---

[8]   In light of this conclusion, which applies to all Defendants, *see Talley*, 111 F.4th at 265, the Court need not consider the timeliness of Helms's claims.

24

**BY THE COURT:**


/s/ Juan R. Sánchez                                
**JUAN R. SÁNCHEZ, J.**